# CHARLES C. CHASE AND OTHERS v. GENERAL ACCIDENT FIRE AND LIFE ASSURANCE CORPORATION, LTD.[1]

January 23, 1948.

No. 34,481.

[1]Reported in 30 N. W. (2d) 633.

O. A. Brecke and E. T. Chesnut, for appellants.
G. P. Mahoney and John S. Morrison, for respondent.

FRANK T. GALLAGHER, JUSTICE.

Plaintiffs appeal from an order denying their motion for a new trial. The only issue in the case is whether the public liability policy issued by defendant to plaintiffs covered the accident suffered on the premises by Sheldon R. Gerarden, a minor, on February 4, 1942.

Plaintiffs, several in number, are the owners as tenants in common of the Haverhill Apartments, 32-36 Spruce Place and 1319-1329 Harmon Place, Minneapolis. The apartment building, excluding the elevator, was insured by defendant, an insurance company, under a policy issued June 5, 1941, and expiring June 5, 1944, against claims for personal injury suffered upon the premises.

The Haverhill Apartments, facing west, is a four-story apartment building. In the east or rear wall of the building there are two courts, and across the exterior of this wall are wooden porches, one on each floor. These porches are about 80 feet long and 8 feet wide. Along the outside of the east side of these porches is a wooden rail 34 inches high, consisting of three horizontal boards, the top board forming the top of the rail. The porches extend across the two courts, and where they cross the courts they are also protected by the same type of rail along the inside edge of the porch. In the south court, there was an elevator shaft running from the ground to the roof of the building, designed to open on each porch level. This shaft was constructed in the following manner: The brick wall of the court formed the north wall of the shaft. The open end of the shaft faced east, and this open end was protected by a gate on each floor. The south wall of the shaft was protected by a railing on

each floor about 5 feet 8 inches high, consisting of five horizontal boards or slats, and along this south side of the shaft the porch floor extended into the court and was protected at the west or court end by a 34-inch rail of the same type as that along the outside of the east side of the porches. The rear or west end of the shaft faced the open court and had a five-slat railing similar to that on the south side of the shaft, but there was no porch extending around that end of the shaft, and it was not accessible from the porch.

On the day of the accident, Sheldon Gerarden, aged six, a son of one of the tenants in the building, climbed over the top of the boards or railing guarding the shaft of the elevator on the south side on the fourth floor of the building, intending to climb down to the third floor. He slipped and fell through the elevator shaft to the bottom and was injured. Suit was brought against plaintiffs by the father on behalf of the injured child. Defendant was notified, but it refused to defend the action, on the ground that the accident sued upon was not covered by the policy in question. That action was settled in September 1944, before trial, for $2,300. Plaintiffs then sued defendant for that amount, plus attorney's fees and costs, claiming that the accident was covered by the terms of the policy.

The provision of the policy having a bearing on the determination of this case is as follows:

"I.   Bodily Injury Liability:

"To pay on behalf of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law for damages, including damages for care and loss of services, because of bodily injury, including death at any time resulting therefrom, sustained by any person or persons, caused by accident and arising out of:

"Division 1.   Premises—Operations. The ownership, maintenance or use, for the purposes stated in the declarations, of the premises, and all operations during the policy period which are necessary or incidental to such purposes;

"Division 2. Elevators. The ownership, maintenance or use, for the purposes stated in the declarations, of any elevator therein designated as insured."

By the terms of the declaration, the elevator in the property was not covered, no premium having been paid for coverage under Division 2. Section 3 of the conditions forming a part of the policy defines the word "elevator" as follows:

"The word 'elevator' wherever used in this policy shall mean any hoisting or lowering device operated between floors or landings and all appliances thereof including any car, platform, shaft, hoistway, stairway, escalator, runway, power equipment and machinery. * * *"

The policy also provided:

"II—Defense, Settlement, Supplementary Payments. It is further agreed that as respects insurance afforded by this policy the corporation shall

"(a). Defend in his name and behalf any suit against the insured alleging such injury and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the corporation shall have the right to make such investigation, negotiation and settlement of any claim or suit as may be deemed expedient by the corporation; * * *."

Plaintiffs claim that the elevator had been locked down and out of use for a considerable period of time before the policy was written and that it was not in use at the time the policy was written or at the time of the accident. They contend, therefore, that the elevator and shaft were part of the premises, inasmuch as the elevator was not in use, and that the elevator was defunct and out of commission so far as the building was concerned. They argue that this fact was known to defendant at the time the policy was written and that plaintiffs did not consider it necessary to take elevator coverage for that reason. Plaintiff Elbridge S. Chase, one of the co-owners and operators of the property, testified that the car or platform used in the elevator was at the bottom on the street level at the time of the accident. He said that the elevator could not have been operated

at that time, because it was locked down with a chain and padlock around the corner of the elevator platform and around the railing at the bottom, and that it had been so locked down "Fully five years prior to the time of this accident." He said that the elevator was not being used any more. Plaintiff Kenneth A. Chase, also one of the co-owners and operators of the property, testified that in connection with his duties in the management of the property he visited the premises nearly every weekday for 18 or 20 years. He was at the premises on the day of the accident shortly after it occurred and found the elevator "padlocked down" when he got there. He further testified that he thought the elevator had been padlocked down for several years prior to the time of the accident and that during that time he had never seen it in use. He testified that the janitor had been instructed not to use the elevator.

The injured boy, aged six at the time of the accident and 11 at the time of trial in January 1947, testified that he had seen the elevator go up and down the elevator shaft "The first time I went in there," but said it was not being used on February 4, 1942, the date of the accident. He was uncertain as to how long he had lived in the building before the accident, but said it "must have been a year or two." He also said that they moved out of the premises right after the accident. In response to a question as to whether he had seen the elevator running either the day of the accident or the day before, he replied, "I didn't see it run at all." In view of the fact that the boy was only about six years old when the accident occurred and at first could not recall whether he had lived in the apartment a month or a year before the accident, but concluded that it must have been a year or two, and because of the further fact that the only time he claims that he ever saw the elevator in use was when he first moved into the building, it would appear that because of the tender years of the boy at the time he moved into the premises with his parents, either one or two years before the accident, little consideration, if any, can be given to his testimony as to the only time he saw the elevator in operation. If it was two years before the accident, it would have been in 1940, when he

was about four years old, and if one year before the accident it would have been in 1941, when he was about five years old. Inasmuch as he was testifying in 1947, six or seven years later, we feel that the testimony of the child as to having seen the elevator in operation when he first moved into the building would be of little weight, especially in contrast with the testimony of the adult plaintiffs above referred to, that the elevator had not been used for several years prior to the accident.

While defendant concedes that the policy or practice of renting unfurnished rooms in the building was changed by the management in 1942, so that the main reason for keeping the elevator in active operation no longer existed, it contends that the elevator was not "defunct" and permanently out of operation, and claims that the record discloses nothing wrong with the elevator except the possible need of replacing some fraying rope. Tape had been wound around the ropes to prevent further damage. Defendant argues that there was no evidence to indicate that the elevator or any part of it had been dismantled or had become unusable.

Defendant further contends that the elevator was not shut down because it was obsolete or so mechanically impaired as to render it useless, and insists that it was still capable of moving up and down the shaft as before. It claims that the elevator was only temporarily discontinued because it was not needed for the time being, and that it was available for its customary use, if necessary, upon the possible replacement of some fraying rope, as it had lost none of its functions as an elevator and was at the command of the management at all times. Plaintiffs argue that it was not necessary to obtain coverage in connection with the elevator, because it was "defunct" as an elevator, but defendant answers this argument by stating that the reason plaintiffs did not carry the elevator coverage was because it was too expensive and that they believed the possibility of an accident was too remote in view of the immobile condition of the elevator. According to the record, the Larson Insurance Agency, which was handling the public liability insurance on the premises, wrote Elbridge S. Chase on September 30, 1941, a few

months after the policy had been written, calling attention to the fact that it was their recollection that the policy did not afford coverage on the elevator and quoting premium rates for the additional elevator coverage. The letter also stated that if coverage was to be extended minor changes would have to be made, such as increasing the height of the gates "so as to act as a further preventive against having children climb over." Kenneth J. Grant, connected with the Larson agency, testified that he called on Mr. Chase with reference to coverage of the elevator, but was unable to persuade plaintiffs to procure additional coverage, as "Mr. Chase figured it was too expensive." Chase testified, however, that he did not think they needed any insurance on the elevator, as he had given the caretaker orders to see that the elevator was locked and that it had not been used for several years before the accident.

The trial court found that by the terms of the declaration the elevator in the property was not covered, that the accident suffered by Sheldon Gerarden was excluded under the terms and provisions of the policy, and that defendant was not liable to plaintiffs in any sum. In its memorandum, the court said that at the time the accident occurred the elevator was not being used, but was locked or chained down at the bottom. In concluding its memorandum, the trial court said in part:

"* * * It should make no difference whether a person gets into the shaft through a door, open or closed, or by climbing into the elevator shaft over the top or otherwise. In either case the terms of the policy exclude such a loss.

"The fact that the elevator was not in use, either temporarily or permanently, at the time is immaterial."

Defendant relies on the following cases where it claims recovery was denied under fact situations similar to the one involved herein: Marcus v. United States Cas. Co. 249 N. Y. 21, 162 N. E. 571; Hagarty v. William Akers, Jr. Co. Inc. 342 Pa. 236, 20 A. (2d) 317; Deban v. Continental Cas. Co. 294 Mass. 412, 2 N. E. (2d) 212. A

review of those cases discloses considerable differences, in our opinion.

In the Marcus case, the injured person, an employe of one of the tenants, was proceeding to a toilet room maintained on the second floor by the owners for the use and convenience of the tenants and their employes. Near the entrance of the toilet were the doors leading into the elevator shaft. There were no distinguishing marks or signs on any of the doors. The employe, mistaking the entrance to the elevator shaft for the entrance to the toilet, pushed open the doors and stepped into the shaft, fell to the bottom, and was injured. In that case, when the policy sued upon was first issued by the insurance company it contained elevator coverage. When delivered to the owner, he informed the agent for the company that he did not want the policy with elevator coverage, because no one used the elevator but himself. Thereupon, the agent took the policy back and had it rewritten, excluding the elevator coverage. Two days after the accident, the owner told the agent to have the policy changed so as to include the elevator. In that case, there could have been no question at the time of the accident that the elevator was not covered by the policy, as this protection was removed at the request of the owner after it had been once included. There is nothing to show that the elevator was not in use, except that this use was confined to the owner.

The fact situation in the Hagarty case is somewhat similar to the Marcus case, in that the injured person entered the elevator shaft through a door at the rear of a taproom in the building, mistakenly assuming it to be the door to the men's room. There, the insurance company had issued a policy of public liability insurance upon the premises, subject to certain exceptions set forth therein, one of which read as follows (342 Pa. 238, 20 A. [2d] 318):

"* * * This policy does not cover any accident: * * * (3) suffered by any person while in, entering or leaving the car of *any* elevator or hoist *not described in the Schedule of Statements,* or by reason of the existence of the well, shaft, or hoistway of *any such*

elevator or hoist, including all machinery and appliances. * * *"
(Italics in text.)

Construing the policy, the court held that it excluded all liability
for the accident which resulted in the injury to appellant. There,
again, there is nothing in the record to show that the elevator was
not in active use.

In the Deban case, the injury was sustained in the operation of the
elevator itself, and one of the exceptions in the policy provided that
the policy did not cover loss on account of injury or death suffered
by any person or persons (294 Mass. 415, 2 N. E. [2d] 214) "being
in or upon any elevator car, or entering upon or alighting therefrom,
or being in or about any elevator well, shaft, hoistway, or equip-
ment thereof unless the same is specifically described in the Schedule
and a premium paid therefor." The policy showed that no elevator
was described in the schedule and that no premium was charged or
paid for any elevator or hoist.

While the trial court reasons in its memorandum that it was im-
material that the elevator was not in use either temporarily or per-
manently at the time of the accident, it appears to us that under
the facts and circumstances of this case it was material. The
definition of the word "elevator" whenever used in the policy under
consideration means "any hoisting or lowering device operated be-
tween floors or landings and all appliances thereof including any
car, platform, shaft, hoistway, stairway, escalator, runway, power
equipment and machinery." In our opinion, this definition refers to
elevators actually in use, even though they might be closed down
for the night or week end or for temporary repairs, and even though
they might not actually be in operation "between floors or landings"
at the moment the accident occurred. It does not mean elevators
locked down, "padlocked," and out of use at the time the accident
occurred and for several years before that. Here, we have a situa-
tion where we are satisfied from the record that the elevator was
not in use at the time of the accident and for at least five years prior
thereto. The owners knew this, and the insurer was at least put on
notice that the owners did not consider the necessity for special

elevator coverage when they notified the insurer's agent that they did not need this coverage even after the matter was called to their attention in defendant's exhibit 1, the letter of September 30, 1941. The elevator was clearly out of use for such period of time as to justify the owners in believing that there was no need for the elevator coverage. The insurer had its own methods of inspection before assuming such a risk, and it assumed whatever risk was embraced within the meaning of the policy. Defendant argues that even though the elevator had been out of use for some time it was in such condition that it could be put back in use very quickly. If that had been done in this case and if the elevator had actually been in use at or shortly prior to the time of the accident, even though not in operation at the moment of the accident, a different question would have been presented. However, the evidence is practically uncontradicted that no hoisting or lowering device had been operated between the floors or landings for a period of about five years, and the elevator had been locked down, padlocked, and out of use. Under those circumstances, it is our opinion that the elevator and shaft had become part of the premises when the policy was written and at the time of the accident so far as the protection under Division 1 of the policy was concerned.

Dunnell, Dig. § 4659, provides as follows:

"The language of a policy, being that selected by the insurer and for its benefit, must be clear and unambiguous, and any reasonable doubt as to its meaning must be resolved in favor of the insured."

In Giacomo v. State Farm Mut. Auto. Ins. Co. 203 Minn. 185, 189, 280 N. W. 653, 656, this court said:

"* * * The rule is invoked that the construction should be in favor of the insured and against the insurer. This rule is a salutary one. The basis of the rule is that the language of policies is selected by the insurer and for its benefit, and if there is any ambiguity as to the meaning of the terms employed by the insurer it should be resolved against it and in favor of the insured."

We have taken into consideration the circumstances surrounding the issuance of the policy here construed. An examination of the premises prior to the issuance of the policy should have revealed that the elevator and platform were not in use. Inquiry should have disclosed that the elevator had not been used for several years prior to the issuance of the policy. The fact that the owners refused to take coverage on the elevator was notice that they considered it part of the premises. We must conclude, therefore, that under the language of the policy the accident suffered by Sheldon Gerarden on February 4, 1942, was not excluded from the coverage of the policy.

Reversed with directions to amend the findings and conclusions in accordance with this opinion and to enter judgment for the plaintiffs.

